1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY PASSER,

11            Plaintiff,                    No. 2:08-cv-2792 KJN P

12       vs.

13   DR. STEEVERS, et al.,                  ORDER and

14            Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding without counsel and in forma pauperis in

17   this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action was reassigned to the

18   undersigned magistrate judge on February 9, 2010.[1]

19          Plaintiff is proceeding on his amended complaint, filed January 7, 2009 (Dkt. No.

20   7), against defendants Manuel Sabin, M.D., and Gregory Burt, M.D., both physicians at

21   California Medical Facility ("CMF") where plaintiff is currently incarcerated.[2]  Presently pending

22

23          [1]  This action is referred to a United States Magistrate Judge pursuant to 28 U.S.C.
     § 636(b)(1)(B), Local General Order No. 262, and E.D. Cal. L.R. ("Local Rule") 302.
24
            [2]  Although service of plaintiff's amended complaint was also found appropriate for CMF
25   physician Calvin Steevers, M.D. (Dkt. No. 8), attempted service of process by the U.S. Marshal
     was unsuccessful (Dkt. No. 14) and plaintiff requested his dismissal (Dkt. No. 24).  The court
26   dismissed Steevers from this action by order filed December 15, 2009.  (Dkt. No. 25.)

                                            1

1    before the court is defendants' motion to dismiss (Dkt. No. 16), which plaintiff opposed (Dkt.

2    Nos. 20, 23, 30), and defendants filed a reply (Dkt. No. 21), and plaintiff's motion to further

3    amend his complaint (Dkt. No. 22).  For the reasons that follow, this court recommends that

4    defendants' motion be denied in full and plaintiff's motion be granted in part.

5    I.  BACKGROUND

6           The amended complaint (Dkt. No. 7) makes the following allegations.  Supporting

7    documents are attached to plaintiff's original complaint.  (Dkt. No. 1, at 23-86.)   Plaintiff alleges

8    that in November 2005, while he was incarcerated at California State Prison-Lancaster ("CSP-

9    L"), he suffered a fall while participating in recreational therapy, injuring his left elbow.  "No

10   medical exam was provided nor a X-ray because the X-ray machine was broken, a sling was

11   provided with instructions not to use my arm."  (Amended Complaint ("AC"), Dkt. No. 7, at 9.)

12   The next month, December 2005, plaintiff was transferred to CMF.  "[U]pon being examined by

13   the receiving Doctor [identified as Dr. Steevers] and given a X-ray [I] was told that because of

14   the treatment I received at LAC [CSP-L] my elbow had healed bent and my arm could not

15   straighten all the way."  (Id. at 4.)  Plaintiff alleges that as a result, and despite physical therapy,

16   he continued to experience pain and instability in his elbow.  (Id. at 4-5.)

17          Upon arriving at CMF, plaintiff asked for a lower bunk assignment due to his

18   elbow injury.  Plaintiff emphasizes that there is no ladder or other climbing device provided for

19   upper bunks.  Approximately January 25, 2005, plaintiff allegedly fell while getting out of his top

20   bunk.  He requested the assistance of "wing clinicians Werth and Durbin" to obtain a lower bunk,

21   who brought that request to the Interdisciplinary Treatment Team ("IDT"), but plaintiff's request

22   was denied.  (Id. at 5.)

23          On March 8, 2006, plaintiff allegedly hurt his right knee while participating in

24   recreational therapy.  Plaintiff was seen by Dr. Steevers on March 27, 2006, who diagnosed a

25   ────────────────

26   Defendants Sabin and Burt waived service of process on July 20, 2009.  (Dkt. No. 11.)

1  sprain and prescribed a knee brace for stabilization; however, plaintiff did not receive the knee

2  brace for many months.  Dr. Steevers allegedly denied plaintiff's request for a lower bunk.  (<u>Id</u>. at

3  5.)

4           On June 2, 2006, plaintiff allegedly "fell while attempting to get into the top bunk

5  when my right knee buckled because of the sprain and lack of knee brace.  My left elbow also

6  buckled when I tried to catch myself as I fell, because of it's injury it couldn't support my

7  weight."  (<u>Id</u>.)  Plaintiff states, "I hit my head on the edge of the top bunk and cut my forehead,

8  wrentched (sic) my neck & back, I landed very awkwardly, my legs sliding apart hurting my left

9  hip and groin and worsening my knee which buckled inward."  (<u>Id</u>.)  Plaintiff was sent to Triage

10 and examined by a nurse and doctor (identified as Nurse Sinclair and Dr. Mark Alchek in

11 plaintiff's proposed Second Amended Complaint, Dkt. No. 22-1).  While "the Dr. . . . did not

12 examine me or order any X-rays or tests to check my injuries he did issue me a single crutch and

13 temporary low bunk handwritten chrono," later prepared in typed form (<u>Id</u>.; Dkt. No. 1, at 26, 27,

14 30.)

15          Despite issuance of these "low-bunk chronos," plaintiff allegedly suffered three

16 more falls before obtaining a lower bunk.  On June 30, 2006, Dr. Steevers "finally agreed to issue

17 a low bunk chrono and ordered it via his voice mail, I witnessed the call to the houseing (sic)

18 sergeant."  (AC at 6; Dkt. No. 1, at 37-38.)  "On 7/03/06 I received my copy of the official low

19 bunk chrono, ten days later [July 13, 2006] the houseing (sic) sergeant finally ordered my move

20 to a low bunk.  [This was] [m]ore than 7 months after I first requested it because of my elbow

21 being damaged and 6 weeks after the triage Dr. ordered it."  (AC at 6.)

22          Also on June 30, 2006, Dr. Steevers ordered an MRI of plaintiff's knee.  (Dkt. No.

23 1, at 37, 38.)  Plaintiff obtained the MRI on August 3, 2006, which disclosed a torn meniscus.

24 (<u>Id</u>. at 40.)  However, allegedly no treatment was offered.  (<u>Id</u>. at 45 (Dr. Steevers wrote that

25 "he's become much less symptomatic since lower bunk placement"); Dkt. No. 7, at 12.)

26 Plaintiff complained of groin and hip problems on August 4, 2006.  (<u>Id</u>. at 42.)

3

1    On November 6, 2006, plaintiff allegedly complained of ongoing neck pain

2 ("constant headaches, neck pain, and grinding when I turn my head") to Dr. Steevers, who told

3 plaintiff to just give it time.  (AC at 12.)  On November 22, 2006, plaintiff sought urgent care for

4 severe neck pain.  The unidentified urgent care doctor ordered a cervical X-ray and pain

5 medication.  (Dkt. No. 1, at 51).  However, plaintiff did not receive the medication.   (AC at 12.)

6 About a week later, on November 30, 2006, plaintiff saw his new primary care physician,

7 defendant Sabin, who allegedly rescinded plaintiff's prescriptions for pain and cold medications,

8 questioning plaintiff's veracity and allegedly stating in part, "I really don't care about your pain."

9 (Id. at 12; Dkt. No. 1, at 51, 54, 56.)  On December 21, 2006, "Dr. Sabin relented and reinstated

10 my pain medication grinning at me and saying, 'Well, maybe all the inmates don't lie and

11 exaggerate.'"  (AC at 6, 12.)  Plaintiff received his pain medication approximately January 3,

12 2007.  (Id. at 13; Dkt. No. 1, at 61.)

13    Meanwhile, on November 29, 2006, plaintiff obtained an X-ray of his neck which

14 showed moderate degenerative changes at his C-5 and C-6 discs with bilateral neural foraminal

15 narrowing; an MRI was recommended.  (AC at 12; Dkt. No. 1 at 58.)

16    On January 30, 2007, plaintiff filed the underlying administrative grievance

17 (CMF-M-07-00307) in this action, stating in full:

18    I an living with pain in my knee & neck.  After continual & repeated
     requests I finally got a MRI on my knee showing a torn meniscus needing
19   surgery – still waiting for the surgery months later –finally was given an
     MRI on my neck which hurts constantly and causes headaches and nausea
20   – still waiting for results.  *Both of these injuries wouldn't even have
     oc[c]urred if I wasn't forced to stay in a upper bunk, without a ladder
21   even after the triage doctor gave me handwritten chrono because of
     earlier falls* and Ms. Wirth and myself asking about a lower bunk in IDT
22   and being told no.

23    I want the surgery on my right knee ASAP – and I want my neck problem
     addressed instead of being stalled off about it.  It took a lot of time – too
24   much time – to even get the tests done — meanwhile I am in pain and still
     don't know the extent of my injury.

25

26 (Opposition, Dkt. No. 20, Exh. A, at 1 (emphasis added); AC at 7.)

4

1          Informal Review of plaintiff's grievance was bypassed, and it was granted at the

2   First Level without comment on February 21, 2007.  (Dkt. No. 20, Exh. A, at 2.)

3          Approximately February 9, 2007, plaintiff obtained an orthopedic consultation

4   and surgery for his knee.  (AC at 13.)

5          On February 20, 2007, plaintiff was assigned a new primary care physician,

6   defendant Burt, who ordered physical therapy for plaintiff's neck.  (Id. at 7.)  However, plaintiff

7   states that "[w]hen I reported for physical therapy, my problem was damaged cervical vertebrae

8   which could be made worse by exercise of the neck."  (Id.)

9          On April 7, 2007, plaintiff "reinstated" the aforementioned grievance (CMF-M-

10  07-00307), stating as follows:

11              I would like to reinstate this 602 complaint, as I explained to the staff at
                level C I had just had surgery on my knee and was supposed to get
12              physical therapy for my neck.  I have been healing for 8 weeks since
                surgery – problem is still present and physical therapist said she couldn't
13              help me.  Need additional surgery and ortho consult for neck.

14  (Dkt. No. 20, Exh. A, at 1.)

15         The reinstated grievance was forwarded directly to Second Level review, which

16  granted the request without comment on May 3, 2007.  (Id. at 2.)

17         Apparently thereafter, "[a]bout 5/xx/07," Dr. Burt ordered three cervical epidural

18  injections which plaintiff received with "no positive effect."  (AC at 7, 13.)  Plaintiff alleges that

19  he later learned, in consultation with the neurosurgeon who operated on plaintiff's neck, that the

20  epidural injections were "both unnecessary and dangerous" because intended to treat

21  inflammation, not the structural damage to plaintiff's discs and vertebrae, and might hide some

22  of plaintiff's pain rendering him more susceptible to further injury.  (Id. at 7, 14.)  Plaintiff

23  asserts that he "believe[s] the physical therapy and epidural injections were done in an effort to

24  convince me that I would have to live with my neck injury, in fact I was told that very thing by

25  Drs. Steevers, Sabin, and Burt . . . and only by heatedly arguing for the tests and consult did I get

26  them.  When I did see the neurological surgeon he said I was in extreme danger of paralysis if I

took a fall or got into a fight at the prison, and although he was booked up for 6 weeks he rushed

me in for surgery." (Id.)[3]

Plaintiff obtained the recommended fusion surgery to his neck on July 2, 2008.

(Dkt. No. 1, at 85-86.)

Plaintiff alleges that he now has "a permanently injured neck that required me to

undergo cervical fusion surgery which as a consequence of I have a five inch scar across my

---

[3] Plaintiff's allegations are supported by the June 20, 2008 report of UCSF Spine Center neurosurgeon Christopher Ames, M.D., who stated in part:

[Plaintiff] is a 50-year-old man with a chief complaint of neck and upper back pain over the last 2 ½ years after a fall off his bed. He apparently had some head and neck trauma at that time. He has been managing it nonoperatively, however, he has had increasingly severe pain since. . . . The patient has been treated with physical therapy and epidural steroid injections x3 all without benefits. He is taking Tylenol for pain. . . .

[The] MRI scan of the cervical spine . . . reveals rather severe C5-6 and C6-7 degenerative disk disease with very severe cervical spinal stenosis at those levels. . . .

Impression:
1.    Very severe cervical spinal stenosis C5-6 and C6-7.
2.    Severe degenerative cervical disk disease C5-6 and C6-7, otherwise unremarkable.
3.    Early cervical spondylotic myelopathy.

Discussion:   The patient has very severe cervical stenosis. He has some early myelopathy and some severe degenerative disease. He has had some steroid injections and physical therapy without benefit. Certainly, I do not think that any more physical therapy is going to benefit the patient. I am also **worried that any other fall o[r] slight bump on his head could be catastrophic and cause quadriplegia for the patient**. He has very severe cervical spinal stenosis. I would recommend an anterior C5-6 and C6-7 ACDF [anterior cervical discectomy and fusion]. This would relieve the pressure on his cord and hopefully help his neck pain significantly and allow him to get some relief from his symptoms. I certainly would recommend this as opposed to watchful waiting because **he is at such high risk for cord injury. . . . risks of walking around and functioning with this on a day-to-day basis, specifically the dangers of becoming quadriplegic**. . . .

(Dkt. No. 1, at 81-82 (emphasis added).)

6

1  throat, a adams apple that still goes sideways when I swallow, two pieces of plastic where my

2  cervical discs were, and a steel plate that is screwed across three of my neck vertebrate with two

3  screws in each, and now has continual permanent pain as well as a sharp searing pain behind my

4  left shoulder whenever I use my left arm for any extended period of time (I happen to be left

5  handed), [a]lso a loss of mobility in my neck." (AC at 7.)  Plaintiff further alleges that "[a]fter

6  fighting for & finally rec[ei]ving the needed tests and consults, I found myself with a knee that

7  had a torn meniscus, a stretched ACL, and arthritis behind the kneecap that developed because of

8  the long delay in the first surgery and that will require a replacement surgery in the future

9  according [to] my ortroscopic (sic) surgeon.  This started as a simple sprain."  (Id.)  "I also have a

10 left arm that won't straighten all the way and hurts when I use it, and numbness and tingleing

11 (sic) in my legs when I walk for 40 [to] 45 minutes or more, and pain in my right groin that hurts

12 whenever I try to exercise. . . . I still have not resolved all the medical issues I.E. The leg

13 numbness & groin pain that has not been addressed as well as the likely future knee replacement

14 surgery the orthopedic surgeon said I will need in the future.  I continue to suffer perpetual pain

15 and loss of quality of life." (Id. at 7-8.)

16           Plaintiff alleges that throughout these events defendants acted with deliberate

17 indifference to his health, safety and serious medical needs, in violation of his rights under the

18 Eighth and Fourteenth Amendments.  Plaintiff concludes:

19              It is therefore my position that my 8th and 14th amendment rights were
               repeatedly violated:  If a **lower bunk chrono had been issued at any of**
20             **my requests prior to the 6/02/06 fall** and/or If clinicians . . . & COs . . .
               had helped when asked and/or If it wasn't **CMF policy to ignore**
21             **temporary low bunk chronos** and/or The medical staff had acted
               expediently and competently then I wouldn't have suffered the pain, stress,
22             injury, surgery, possible likely future surgery and continueing (sic)
               unresolved medical problems I have been dealing with for the last three
23             years and ongoing because of these **completely avoidable falls**.

24 (Id. at 8 (emphasis added).)

25           On June 30, 2010, plaintiff filed a "Notice of Receipt" of an "Appeal Denied at

26 the Directors Level." (Dkt. No. 28.)  Plaintiff notes therein that he filed an "additional 602

                                              7

1    Appeal that specifies his complaints in more detail" which was denied at the Director's Level on

2    June 22, 2010.

3           Defendants contend that plaintiff's amended complaint should be dismissed due

4    to plaintiff's failure to exhaust administrative remedies.  Plaintiff opposes the motion and seeks

5    leave to file a Second Amended Complaint.

6    II.  MOTION TO DISMISS

7          A.  Legal Standards

8           The Prison Litigation Reform Act ("PLRA") provides that, "[n]o action shall be

9    brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by

10   a prisoner confined in any jail, prison, or other correctional facility until such administrative

11   remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Pursuant to this rule, prisoners

12   must exhaust their administrative remedies regardless of the relief they seek, i.e., whether

13   injunctive relief or money damages, even though the latter is unavailable pursuant to the

14   administrative grievance process.  Booth v. Churner, 532 U.S. 731, 741 (2001).  Moreover, such

15   exhaustion requires that the prisoner complete the administrative review process in accordance

16   with all applicable procedural rules.  Woodford v. Ngo, 548 U.S. 81 (2006).

17          "California's Department of Corrections provides a four-step grievance process

18   for prisoners who seek review of an administrative decision or perceived mistreatment.  Within

19   fifteen working days of 'the event or decision being appealed,' the inmate must ordinarily file an

20   'informal' appeal, through which 'the appellant and staff involved in the action or decision

21   attempt to resolve the grievance informally.' Cal. Code Regs., tit. 15, §§ 3084.5(a), 3084.6(c).  If

22   the issue is not resolved during the informal appeal, the grievant next proceeds to the first formal

23   appeal level, usually conducted by the prison's Appeals Coordinator.  Id. §§ 3084.5(b),

24   3084.6(c).  Next are the second level, providing review by the institution's head or a regional

25   parole administrator, and the third level, in which review is conducted by a designee of the

26   Director of the Department of Corrections.  § 3084.5(e)(1)-(2)."  Brown v. Valoff, 422 F.3d 926,

8

1   929-30 (9th Cir. 2005).  The PLRA requires that these administrative remedies be exhausted

2   prior to filing suit.  McKinney v. Carey, 311 F.3d 1198 (9th Cir. 2002).

3              "The level of detail in an administrative grievance necessary to properly exhaust a

4   claim is determined by the prison's applicable grievance procedures."  Jones v. Bock, 549 U.S.

5   199, 218 (2007).  In California, prisoners are required to lodge their administrative complaint on

6   a CDC Form 602 which in turn requires only that the prisoner "describe the problem and action

7   requested."  Cal. Code Regs. tit. 15, § 3084.2(a).  In Griffin v. Arpaio, 557 F.3d 1117 (9th Cir.

8   2009), adopting the standard enunciated in Strong v. David, 297 F.3d 646 (7th Cir. 2002), the

9   Ninth Circuit held that "when a prison's grievance procedures are silent or incomplete as to

10  factual specificity, 'a grievance suffices if it alerts the prison to the nature of the wrong for which

11  redress is sought.'"  Griffin, 557 F.3d at 1120 (reviewing Arizona procedures), quoting Strong,

12  297 F.3d at 650.  "A grievance need not include legal terminology or legal theories unless they

13  are in some way needed to provide notice of the harm being grieved.  A grievance also need not

14  contain every fact necessary to prove each element of an eventual legal claim.  The primary

15  purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay

16  groundwork for litigation."  Griffin, 557 F.3d at 1120; accord, Morton v. Hall, 599 F.3d 942, 946

17  (9th Cir. 2010) (California grievance procedures).

18             Further, absent an express requirement to the contrary (which does not exist in the

19  California prison grievance process) "exhaustion is not per se inadequate simply because an

20  individual later sued was not named in the grievances."  Jones, 549 U.S. at 219.  It is nonetheless

21  appropriate to require that a prisoner demonstrate, through the administrative grievance process

22  and consistent with the PLRA, that he has standing to pursue his claims against a particular

23  defendant.  "[A]t an irreducible minimum, Art[icle] III [of the United States Constitution]

24  requires the party who invokes the court's authority to 'show that he personally has suffered

25  some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"

26  Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454

9

1  U.S. 464, 472 (1982) (quoting <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99

2  (1979).

3         The exhaustion requirement applies to all section 1983 claims regardless whether

4  the prisoner files his or her claim in state or federal court.  <u>Johnson v. Louisiana ex rel. Louisiana</u>

5  <u>Dept. of Public Safety and Corrections</u>, 468 F.3d 278 (5th Cir. 2006).  Significantly, however,

6  this exhaustion requirement is not jurisdictional but an affirmative defense that may be raised by

7  a defendant in a non-enumerated Rule 12(b) motion.  <u>See</u> <u>Jones</u>, 549 U.S. at 216 ("[I]nmates are

8  not required to specially plead or demonstrate exhaustion in their complaints."); <u>Wyatt v.</u>

9  <u>Terhune</u>, 315 F.3d 1108, 1117-19 (9th Cir. 2003) (failure to exhaust is an affirmative defense).

10 Defendants bear the burden of raising and proving the absence of exhaustion, and their failure to

11 do so waives the defense.  <u>Id</u>. at 1119.

12         "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the

13 court may look beyond the pleadings and decide disputed issues of fact."  <u>Id</u>.  "I[f] the district

14 court looks beyond the pleadings to a factual record in deciding the motion to dismiss for failure

15 to exhaust – a procedure closely analogous to summary judgment – then the court must assure

16 that [the prisoner] has fair notice of his opportunity to develop a record."  <u>Id</u>. at 1120, n. 14.

17 However, when the district court concludes that the prisoner has not exhausted administrative

18 remedies on a claim, "the proper remedy is dismissal of the claim without prejudice."  <u>Id</u>. at

19 1120; <u>see also</u> <u>Lira v. Herrera</u>, 427 F.3d 1164, 1170 (9th Cir. 2005) ("mixed" complaints may

20 proceed on exhausted claims).  Thus, "if a complaint contains both good and bad claims, the

21 court proceeds with the good and leaves the bad."  <u>Jones</u>, 549 U.S. at 221.

22     B.  <u>Discussion</u>

23         The parties have identified three administrative grievances filed by plaintiff at

24 CMF.  Only one of these is relevant to the instant action.

25         The most recently-filed administrative grievance was brought to the court's

26 attention by plaintiff on June 30, 2010.  (Dkt. No. 28).  Although a copy of the grievance was not

1  attached,[4] plaintiff states that he filed an "additional 602 Appeal that specifies his [current]

2  complaints in more detail" and that it was denied at the Director's Level on June 22, 2010, thus

3  exhausting plaintiff's claims before this court.  However, as defendants point out (Dkt. No. 29),

4  the PLRA requires that administrative remedies be exhausted *prior* to filing suit.  42 U.S.C. §

5  1997e(a); McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).  Plaintiff filed the instant

6  action on November 20, 2008 and, thus, it may not be premised on an administrative grievance

7  exhausted on June 22, 2010.

8           Similarly, this action may not be premised on plaintiff's administrative grievance

9  filed April 26, 2007.  Defendants have informed the court of this grievance, noting that "Plaintiff

10  filed a grievance on April 26, 2007 (CMF-M-07-01150) stating that defendant Burt

11  recommended a high protein, low carbohydrate diet to treat his high cholesterol and high blood

12  pressure," such grievance was "denied at the first and second levels of review," and "[p]laintiff

13  did not seek a Director's level review."  (Dkt. No. 16-1, at 2, citing Lewis Decl., Exh. B, Dkt.

14  No. 16-2, at 3, ¶ 6.)  Plaintiff does not challenge these representations and the substance of that

15  grievance is not reflected in the allegations of plaintiff's amended complaint.  Thus, this action is

16  not premised on plaintiff's administrative grievance filed April 26, 2007.

17           The only administrative grievance underlying this action is the one filed by

18  plaintiff on January 30, 2007, and "reinstated" on April 7, 2007 (CMF-M-07-00307).  Plaintiff

19  has provided the (apparently complete) copy of this grievance (see Dkt. No. 20, Exh. A); while

20  defendants reference it (see Dkt. No. 16-1, at 2, Dkt. No. 16-2, at 3, ¶ 4 (noting it is attached as

21  "Exhibit A-1")), but they did not provide a copy.  Defendants rely on the affidavit of D. Lewis,

22  CMF Appeals Coordinator during the relevant period (November 2005 to January 7, 2009), who

23  describes the grievance as follows:  "Passer filed appeal log number CMF-M-07-00307 on

24

25       [4] Plaintiff has elsewhere submitted copies of grievances he filed on November 2, 2009
    and November 13, 2009.  (Dkt. No. 23, at 10-11, 13-14.)   It is unclear whether either of these is
26  the grievance denied at the Director's Level on June 22, 2010.

February 1, 2007 requesting surgery on his knee and an MRI of his neck.  This appeal was

granted at the second level and Plaintiff was given surgery and an MRI. . . ."  (Mtn. Dism., Dkt.

No. 16-2, at 3, ¶ 5.)  Defendants have also submitted the affidavit of current CMF Appeals

Coordinator D. Evangelista Taylor who states that plaintiff "filed no appeals pertaining to his

medical care from August 1, 2008 to January 7, 2009."  (Id. at 6, ¶ 4.)

        Defendants concede that plaintiff exhausted this grievance insofar as he was not

required to seek Director's Level review because the grievance "was fully granted at the second

level."  (Reply, Dkt. No. 21, at 1-2 n. 1 and related text.)  Although defendants cite no legal

authority, their position is supported by the Ninth Circuit's holding in Brown v. Valoff, 422 F.3d

926, 935 (9th Cir. 2005) ("a prisoner need not press on to exhaust further levels of review once

he has . . . received all 'available' remedies at an intermediate level of review ").

        Rather, defendants contend that "the administrative grievance only claims that

Plaintiff was not provided surgery for his torn meniscus and had not been given an MRI and

surgery for his neck."  (Dkt. No. 21, at 2-3.)  Defendants contend that because plaintiff did not

file administrative grievances "stating that Defendant Sabin discontinued his medication or failed

to examine and treat him for injuries sustained from falling from his bunk," or "alleging that

Defendant Burt inappropriately prescribed epidural injections," plaintiff "failed to exhaust

administrative remedies, and this matter should be dismissed."  (Dkt. No. 16-1, at 4; Dkt. No. 21,

at 3.)  Defendants also argue that even if the court liberally construes the filing date of plaintiff's

grievance as the "reinstated" date of April 7, 2007, the grievance pre-dates and therefore cannot

possibly include plaintiff's allegations that defendant Burt inappropriately prescribed epidural

injections.  (Dkt. No. 21, at 2-3.)  Defendants contend, albeit implicitly, that because plaintiff

obtained the requested surgeries on his knee and neck, and did not articulate in his grievance the

above-noted allegations, there are no remaining issues for this litigation.

        Defendants construe plaintiff's grievance too narrowly.  Plaintiff's grievance did

not merely seek further treatment for his knee and neck, but clearly challenged the quality of

1   medical care plaintiff had received to date.  As earlier noted, a grievance need not contain every

2   fact necessary to prove each element of a legal claim, but need only "alert the prison to a problem

3   and facilitate its resolution."  Griffin, 557 F.3d at 1120.  In order to demonstrate violation of the

4   Eighth Amendment based on inadequate medical care, plaintiff must prove "acts or omissions

5   sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v.

6   Gamble, 429 U.S. 97, 106 (1976).  "[I]t is enough that the official acted or failed to act despite

7   his knowledge of a substantial risk of serious harm."  Farmer v. Brennan, 511 U.S. 825, 842

8   (1994).  "[T]he more serious the medical needs of the prisoner, and the more unwarranted the

9   defendant's actions in light of those needs, the more likely it is that a plaintiff has established

10  deliberate indifference on the part of the defendant."  McGuckin v. Smith, 974 F.2d 1050, 1061

11  (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th

12  Cir. 1997) (en banc).

13          Thus, while defendants are correct that plaintiff did not (and could not) exhaust

14  his claims that Burt improperly prescribed epidural injections to treat his neck injury, plaintiff's

15  grievance sufficiently articulated an Eighth Amendment claim against both named defendants for

16  alleged deliberate indifference to plaintiff's serious medical needs.  The fact that plaintiff

17  ultimately obtained requested diagnostic tests and surgeries does not necessarily resolve

18  plaintiff's claim that his care was inadequate.  While the precise allegations against each

19  defendant remain distinct, limited to the dates and scope of each physician's responsibility in

20  caring for plaintiff – e.g., that Dr. Sabin, upon assuming plaintiff's care on November 30, 2006,

21  improperly rescinded plaintiff's prescription for pain medication and failed to properly treat

22  plaintiff's knee and neck injuries; and that Dr. Burt, upon assuming plaintiff's care on February

23  20, 2007 (apparently after plaintiff's knee surgery), failed to properly treat plaintiff's neck injury

24  – these allegations are nonetheless exhausted.  As previously noted, "exhaustion is not per se

25  inadequate simply because an individual later sued was not named in the grievance[]," provided

26  that the defendants' challenged conduct can reasonably be deduced from the grievance.  Jones,

13

549 U.S. at 219.  Thus, the court finds that plaintiff administratively exhausted his claim of deliberate indifference to serious medical needs, in violation of the Eighth Amendment, against defendants Sabin and Burt.

The above-reasoning also supports exhaustion of plaintiff's Eighth Amendment claim against Dr. Mark Alchek.  As discussed below, plaintiff's motion for leave to further amend his complaint should be granted to permit the inclusion of Dr. Alchek.

Defendants' construction of plaintiff's grievance is too narrow in another respect. While plaintiff clearly challenged the quality of his medical care, he also plainly alleged that he would not have sustained his neck injury nor exacerbated his knee injury had he been timely assigned a lower bunk.  This allegation is made both in plaintiff's administrative grievance and in the instant action, and states a potential prima facie Eighth Amendment claim for deliberate indifference to plaintiff's health and safety, i.e., failing to protect plaintiff from harm.  "[A] prison official violates the Eighth Amendment when two requirements are met.  First, the deprivation alleged must be, objectively, 'sufficiently serious'. . . .  For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Farmer v. Brennan, 511 U.S. at 834. Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind' . . . [T]hat state of mind is one of 'deliberate indifference' to inmate health or safety."  Id.  The prison official will be liable only if "the official knows of and disregards an excessive risk to inmate health and safety; the officials must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.

Significantly, this claim does not appear to be actionable against either currently named defendant because plaintiff obtained a lower bunk on July 13, 2006, prior to receiving treatment from either defendant.  However, because plaintiff should be permitted to amend his complaint to add Alchek as a defendant, plaintiff should also be permitted this opportunity to

1   name those individuals responsible for making, implementing and enforcing bunk assignments

2   within his housing unit during the relevant period, especially to the extent that any such

3   individual allegedly disregarded a medical order or recommendation to assign plaintiff to a lower

4   bunk.

5          For the foregoing reasons, this court recommends that defendants' motion to

6   dismiss plaintiff's amended complaint be denied.

7   III.  <u>MOTION TO AMEND</u>

8          Plaintiff moves for leave to file a further amended complaint.  (Dkt. No. 22.)

9   Defendants have not expressly opposed the motion, relying instead on the merits of their motion

10  to dismiss.  For the following reasons, the court will recommend that plaintiff's motion be

11  granted in part.

12         Under the present circumstances, a party may amend a pleading only by leave of

13  court or by written consent of the adverse party.  Fed. R. Civ. P. 15(a)(2).  A court should freely

14  grant leave to amend when justice so requires.  <u>Id</u>.  As the Supreme Court has articulated:

15         In the absence of any apparent or declared reason– such as undue delay,
           bad faith or dilatory motive on the part of the movant, repeated failure to
16         cure deficiencies by amendments previously allowed, undue prejudice to
           the opposing party by virtue of allowing the amendment, futility of the
17         amendment, etc.– the leave sought should, as the rules require, be "freely
           given."
18

19  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  "Liberality in granting a plaintiff leave to amend is

20  subject to the qualification that the amendment not cause undue prejudice to the defendant, is not

21  sought in bad faith, and is not futile.  Additionally, the district court may consider the factor of

22  undue delay [although] [u]ndue delay by itself . . . is insufficient to justify denying a motion to

23  amend."  <u>Bowles v. Reade</u>, 198 F.3d 752, 757-58 (9th Cir. 1999).

24         Plaintiff seeks to further amend his complaint in order to add as defendants the

25  emergency medical personnel who treated plaintiff immediately after his fall on June 2, 2006,

26

specifically, Nurse D. Sinclair and Dr. Mark Alchek.  Plaintiff states that Nurse Sinclair "took my report (which is missing from my medical records) and acted as the reviewing medical staff," while Dr. Alchek "was the attending physician."  Dkt. No. 22-1, at 5.  It is plaintiff's contention, also generally set forth in his currently operative complaint, that "[n]either made any attempt to treat my forehead cut, examine me or order any tests to try to ascertain the extent of my injuries," although "[t]his visit did result in the issuing of a handwritten chrono" for a lower bunk.  Id.

The court finds that justice requires the inclusion of Dr. Alchek in this action. Fed. R. Civ. P. 15(a)(2).  Not only was he allegedly the first official to prescribe a lower bunk, but he was allegedly the first medical personnel to assess plaintiff's condition after his June 2, 2006 fall, and thus the first to assess plaintiff's neck injury, as well as the alleged exacerbation of plaintiff's knee injury.  These matters are central to plaintiff's suit.  Adding Alchek to this action is not futile, is not requested in bad faith, and will not result in undue delay or prejudice to defendants.  However, the inclusion of Nurse Sinclair is not necessary to this action; his or her triage assessment was made nearly simultaneously with that of Dr. Alchek, who held the authority for making treatment decisions.  Thus, plaintiff should be permitted the opportunity to further amend his complaint to add Alchek, but not Sinclair, as a defendant in this action

Additionally, for the reasons noted above, plaintiff should be given further opportunity to identify and name the defendant(s) allegedly responsible for granting or denying and implementing his repeated requests for a lower bunk.  Although Dr. Steevers allegedly twice denied plaintiff's medical requests for a lower bunk (when plaintiff was transferred to CMF in December 2005, and when plaintiff hurt his knee in March 2006), he then allegedly ensured that plaintiff obtained a lower bunk (June 30, 2006 "chrono" implemented July 13, 2006).  However, Steevers has been dismissed from this action at plaintiff's request due to the inability of plaintiff to locate him for service of process.  (Dkt. Nos. 24, 25.)  Moreover, after Dr. Alchek first ordered a lower bunk on June 2, 2006, plaintiff allegedly had three more falls before he actually obtained a lower bunk on July 13, 2006.  Since plaintiff should be permitted leave to add Alchek

1    to this action, he should also be permitted the opportunity to clarify the facts and identify the

2    individuals allegedly responsible for refusing his repeated requests for a lower bunk,

3    commencing with plaintiff's transfer to CMF in December 2005.  Plaintiff is cautioned, however,

4    that the addition of such defendants requires supported allegations demonstrating an actual

5    connection or link between the actions of the defendant(s) and the failure of plaintiff to obtain a

6    requested lower bunk.  See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo

7    v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a

8    constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in

9    another's affirmative acts or omits to perform an act which he is legally required to do that

10    causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th

11    Cir. 1978).  Subject to these guidelines, plaintiff should be permitted to further amend his

12    complaint to identify those individuals, to the extent he can, directly responsible for the failure of

13    plaintiff to timely obtain a lower bunk, especially to the extent that any such individual allegedly

14    disregarded a medical order or recommendation to assign plaintiff to a lower bunk.

15          The court will therefore recommend that plaintiff's motion to further amend his

16    complaint be granted in part; the motion should be denied insofar as the proposed amended

17    complaint attached to plaintiff's motion should be disregarded.

18          Should plaintiff file a Second Amended Complaint, it shall comply with the

19    standards set forth by this court in its order filed December 11, 2008 (Dkt. No. 4).

20    IV.  CONCLUSION

21          IT IS HEREBY ORDERED that:

22          1.  The Clerk of Court is directed to randomly assign a district judge to this action.

23          Further, for the foregoing reasons, IT IS HEREBY RECOMMENDED that:

24          1.  Defendants' motion to dismiss (Dkt. No. 16) plaintiff's amended complaint be

25    denied; and

26          2.  Plaintiff's motion to file a Second Amended Complaint (Dkt. No. 22) be

granted in part;

　　　　3.  Plaintiff's proposed amended complaint (attached to Dkt. No. 22) should be disregarded;

　　　　4.  Plaintiff should be permitted thirty days after service of the district judge's order adopting these findings and recommendations to file a Second Amended Complaint that conforms to the standards set forth herein; should plaintiff fail to timely file such Second Amended Complaint, the currently operative amended complaint (Dkt. No. 7) shall remain in effect.

　　　　These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 21 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 6, 2010

　　　　　　　　　　　　　　　　　　　KENDALL J. NEWMAN
　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

pass2792.mtd

18